Filed 1/22/14  P. v. Perez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037988 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC942929) |
| v. | |
| ANGEL REYNAGA PEREZ, | |
| Defendant and Appellant. | |

Defendant Angel Reynaga Perez was convicted by jury trial of six counts of second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c)),[1] three counts of false imprisonment (§§ 236, 237), two counts of reckless evading (Veh. Code, § 2800.2, subd. (a)), and one count of vandalism (§ 594, subds. (a), (b)(1)).  The jury found true firearm allegations (§§ 12022, subd. (a)(1), 12022.53, subds. (b), (c)(1)), gang allegations (§ 186.22, subd. (b)(1)(C)), and allegations that defendant had taken property valued at more than $65,000 (§ 12022.6, subd. (a)(1)) in the commission of the robbery counts. Firearm and gang allegations were also found true as to the false imprisonment offenses. The court found true that defendant had suffered a prior conviction that was a strike (§§ 667, subds. (b)-(i), 1170.12) and a serious felony (§ 667, subd. (a)) and that he had

---

[1]     Subsequent statutory references are to the Penal Code unless otherwise specified.

served a prison term for that conviction. The court denied defendant's motion for a new trial based on newly discovered evidence. Defendant was sentenced to 47 years and 8 months in prison and ordered to pay $168,375 in restitution.

On appeal, defendant contends that (1) the trial court abused its discretion in denying his new trial motion, (2) the trial court abused its discretion in refusing to bifurcate the gang allegations, (3) the jury's true findings on the gang allegations are not supported by substantial evidence, (4) defendant should have been convicted of only one reckless evading count, (5) the trial court erred in imposing terms for both the section 186.22 gang enhancement and the section 12022.53 firearm enhancement, and (6) the court's restitution order is not supported by the evidence. The Attorney General concedes the last two points, and we accept the concessions. We reject the remainder of defendant's arguments. Accordingly, we reverse the judgment and remand for resentencing and for a new restitution hearing.

## I. Factual Background

At about 10:50 a.m. on May 5, 2009, a silver Honda entered the parking lot of Joe Escobar Diamonds in Campbell. The Honda belonged to defendant's girlfriend's sister, who lived in the duplex adjoining the one where defendant's girlfriend lived.[2] Three men got out of the Honda and went into Joe Escobar Diamonds, while the driver of the Honda positioned the Honda for a quick getaway by backing into a parking space and leaving the door open. The men who entered the store put a stick in the entrance door to keep it from closing all the way. The door was a self-locking one and would have locked them inside had it closed. All three men were dressed in black and wearing hooded

---

[2] Defendant's girlfriend's sister claimed that her Honda had been stolen 15 minutes before the robbery.

sweatshirts, black masks, and black gloves, except that one was wearing a red ski mask. One of the men had a gun. The gunman's jeans had a distinctive bleach stain on the back of the right leg.[3]

The gunman said: "'Everybody get on the ground. This is a hold up.'" "'No one move.'" Eight employees, one customer, and the customer's two children were in the store. The gunman pointed the gun at several employees and at the customer and his children. The men used a hammer to smash a display case holding Rolex watches and took more than a dozen Rolex watches from it.[4] They dropped one Rolex inside the store on their way out, but they got away with 14 Rolex watches, which had a retail value of $163,000. After they got outside, they dropped some of the watches but picked them up and took the dropped watches with them. The Honda started moving before the three men got into it.

Several Joe Escobar Diamonds employees called 911 and pushed a "panic button" as soon as the robbery began. Campbell Police Officer Steven Lee Norris was just a couple of blocks from Joe Escobar Diamonds when he received a dispatch about the robbery. He immediately drove there. As Norris approached Joe Escobar Diamonds, he saw a silver Honda exiting the parking lot. Norris was going northbound and the Honda turned southbound. Norris decided to get a good look inside the Honda to see if it might be involved in the robbery. He pulled his patrol vehicle into the southbound lane going the wrong direction. When the Honda reached him, it swerved to avoid him, and Norris

---

[3] The robbery was captured on video by numerous surveillance cameras inside the store. The bleach stain on the gunman's jeans could be seen on the video.

[4] The vandalism count was based on the smashing of the display case.

3

got a good look at the driver, who was wearing white gloves.  The driver was "a Hispanic male, 20 to 25 years old.  Short hair.  Shaved head.  And clean shaven."[5]

Campbell Police Sergeant Joe Cefalu also responded to the dispatch, and he saw the Honda swerve around Norris's vehicle.  Cefalu began pursuing the Honda with his lights and siren on and Norris behind him.  The Honda pulled up next to a nearby parked Dodge Charger that belonged to defendant's girlfriend.[6]  The rear passenger door of the Honda opened, and someone started to get out of the car.  However, the person did not get out, and the Honda proceeded.  Campbell Police Officer Jesus Alonzo, who was in a third marked police vehicle, soon joined the pursuit as the lead vehicle.  Alonzo also had his lights and siren on.  The Honda was being driven in a very dangerous fashion; it failed to stop at stop signs, got onto the freeway, and sped up to nearly 100 miles per hour with the police in pursuit.  The Honda exited the freeway, ran a red light, and went through the intersection at 70 miles per hour.  Alonzo slowed down, but his vehicle was hit by another car at the intersection.  The police then lost sight of the Honda.

The police theorized that the Dodge Charger was a second getaway vehicle for the robbers.  A search of the Dodge Charger turned up a photograph of defendant and his girlfriend.[7]  This photograph was shown to Norris about an hour after the robbery, and he identified the man in the photo as the driver of the Honda.  The only difference in

---

[5]     Norris testified that he did not mean by "shaved head" that the man was hairless but that he had very short hair.  At the time, defendant had no facial hair, and his hair was "shaved . . . very short."

[6]     The Charger was unlocked, and its hood was warm, indicating that it had been recently driven.  It contained two cell phones and three pairs of sunglasses.  One of the cell phones belonged to Mario Zamora.

[7]     Defendant's and his girlfriend's California identification cards were later found in an "overhead sunglass case" in the Charger along with "paperwork" addressed to defendant and a bail bond receipt with defendant's name on it.

4

appearance that Norris noted was that the man in the photo had a mustache, while the driver had been clean-shaven. Norris was certain that this man was the driver.

About an hour after the police lost sight of the Honda, the Honda was found parked in a residential area a few miles from where it had last been seen.[8] The Honda's engine was running, and its windshield wipers were going. It was parked "very crooked" and partially obstructing the roadway. Two Rolex watches, a black ski mask, and a black glove were found inside the Honda. Two pairs of jeans and a black long-sleeved sweatshirt had been discarded in a nearby backyard. In the pocket of one of the pairs of jeans was a key to the Dodge Charger. The other pair of jeans had the distinctive bleach stain on the back of the right leg that had been seen on the gunman's jeans, and this pair of jeans contained a traffic citation in the name of Ezell Banks. A black ski mask, a black hooded sweatshirt, and a pair of black gloves were found in a nearby recycling bin.

Several bystanders near where the Honda had been abandoned told the police that they had seen two men nearby who were sweaty and looked like they had been running. One of the men asked a bystander if he could use his cell phone, but the bystander refused. Another bystander allowed one of the men to use his cell phone. The bystander who had refused was shown a lineup including defendant's photo, and he said that the man who asked to use his cell phone looked "kinda" like defendant. That bystander's sister thought that the other man looked like Ezell Banks.

An undercover officer was keeping an eye on the Charger. At 2:30 p.m. that day, a red Dodge Caravan minivan owned by defendant's mother pulled up next to the Charger. Defendant got out of the minivan, opened the passenger door of the Charger, and briefly leaned into the Charger. He then returned to the driver's seat of the minivan and drove off. The undercover officer followed the minivan, and Cefalu joined him. The

---

[8] During the pursuit, the police had acquired the Honda's license plate number.

5

minivan proceeded onto southbound Highway 17 and then took southbound Highway 85. Cefalu did not activate his lights and sirens at first, not wanting to "spook" the occupants of the minivan. Eventually, the minivan began going 95 miles per hour, and Cefalu put on his lights and siren. The minivan sped up and drove on the shoulder trying to elude Cefalu. It exited Highway 85 and ran a red light. The minivan sped through residential neighborhoods. Cefalu eventually terminated his pursuit of the minivan because there was a school in the area and it was too dangerous to continue.

A few minutes after Cefalu lost sight of the minivan, San Jose Police Officer Michael Lloyd, who had heard the dispatch about the pursuit, saw the minivan a couple of miles away from where Cefalu had last seen it and began pursuing it. Lloyd pursued the speeding minivan with his lights and siren activated, and the minivan turned down a dead-end street. When the minivan reached the dead-end, it turned around and came back at Lloyd's patrol car, which was in the middle of the roadway. To avoid a head-on collision, Lloyd turned his vehicle at the last moment, but the minivan still clipped the back of Lloyd's patrol car. Lloyd got a look at the driver, and it was defendant. Lloyd went after the minivan, but the minivan ran stop signs and drove at 70 to 90 miles per hour. Lloyd eventually lost sight of the minivan, but it was soon found parked on Roundtable Drive, which was in a nearby San Jose residential area.[9]

At 3:20 p.m., the police set up surveillance of the minivan. Defendant's girlfriend called his brother's girlfriend and asked her to give defendant a ride home from Roundtable Drive in San Jose. The brother's girlfriend drove to that location and picked defendant up. After she picked up defendant, the police saw her pull her car up near the minivan and stop. It was less than 15 minutes after the police surveillance had begun.

---

[9] At some point, defendant called his mother and told her that he had her minivan and the police had been chasing him.

6

Defendant got out of her vehicle, looked around, and then got back in her vehicle. Her vehicle was stopped by the police a few minutes later. Before her vehicle came to a stop, defendant jumped out and ran. A police officer pursued him on foot but lost sight of him. A perimeter was set up. Another officer saw defendant running nearby. The police conducted an intense search of that area, and a police dog found defendant hiding under a portable barbeque in a backyard. Defendant did not respond to commands from police officers, and the dog bit him. When he was arrested, defendant was wearing red shorts.[10] His mother's cell phone was found near where he had been hiding.

Meanwhile, the police were also watching defendant's home. At 3:30 p.m., defendant's brother drove up to the house in a Cadillac and got out of the car. He went into the house and came back out 15 minutes later carrying a small bag. Defendant's brother drove away in the Cadillac, and the police stopped the car. A bag in the front of the car contained a black T-shirt, a black ski mask, and a red ski mask. The red ski mask was wrapped around 13 Rolex watches that had been taken in the robbery.[11] Defendant's DNA was found inside the red ski mask.

## II. Procedural Background

The information charged defendant with six counts of robbery, three counts of false imprisonment, three counts of reckless evading, vandalism, and assault on a police officer (§ 245) plus the gang, firearm, excessive taking, prior conviction, and prison prior

---

[10] When defendant's brother's girlfriend picked him up, defendant was wearing a striped shirt and jeans.

[11] The record does not explain the discrepancy in the number of Rolexes. Fourteen were taken. Two were found in the Honda. Thirteen were found in the bag. Where the additional Rolex came from is unknown.

allegations. The prior conviction and prison prior allegations were bifurcated. The court refused to bifurcate the gang allegations.

The jury was unable to reach a verdict on the assault count and one of the three reckless evading counts. The jury convicted defendant of all of the other counts and found the gang, firearm, and excessive taking allegations true. Defendant waived his right to a jury trial on the prior conviction and prison prior allegations, and the court found those allegations true.

The court denied defendant's new trial motion, refused to strike the prior conviction finding, and refused to reduce the false imprisonment counts to misdemeanors. Defendant was committed to state prison to serve a term of 47 years and 8 months.[12] He timely filed a notice of appeal.

---

[12]  Defendant faced a maximum sentence of over 90 years in prison. The probation department recommended a 36-year prison term, and the prosecution sought a prison term of more than 67 years. One of the robbery counts was selected as the principal count, and the three-year midterm was doubled for a six-year principal term. A consecutive one-year term was added for the section 12022 arming enhancement but stayed, and another year was added for the excessive taking enhancement. A 10-year term was added for the section 186.22 gang enhancement, and another 10-year term for the section 12022.53 firearm enhancement. That added up to 27 years for that count. The second robbery count garnered a consecutive term of two years plus three years and four months for the section 12022.53 firearm enhancement. The court stayed the remaining enhancements. Three of the remaining robbery counts received concurrent terms, but the final robbery count got a consecutive sentence just like the one for the second robbery count. Two of the three false imprisonment counts received consecutive terms of 20 months each, while the other was run concurrent. One of the reckless evading counts received a consecutive term of 20 months, while the other was run concurrent. The vandalism sentence was run concurrent. And a five-year term was imposed for the prior serious felony enhancement.

8

### III. Discussion

### A. Denial of New Trial Motion

Defendant contends that the trial court erred in denying his new trial motion, which was based on newly discovered evidence. The trial court found that the new evidence, which was a statement by an alleged coparticipant, was not admissible under the hearsay exception for statements against penal interest.

### 1. Background

The prosecutor's theory at trial was that defendant was the getaway driver, Mario Zamora was one of the robbers, and Ezell Banks was the gunman. The police had several other suspects who they believed were involved in either the robbery itself or the planning of it. The defense argued at trial that defendant had not been the driver of the Honda and that Norris had wrongly identified defendant as the driver of the Honda. The defense asserted that the prosecution's theory was inconsistent with the evidence that the red ski mask, on which defendant's DNA had been found, had been worn by one of the robbers who went into the store. The defense intimated that defendant's DNA had come to be on the red ski mask not because he was involved in the robbery but because defendant's brother, who lived in the same home as defendant and had access to defendant's clothing, had been involved in the robbery. Although the defense conceded that defendant had driven the minivan, it claimed that he had done so only to help out his brother.

Two months after the jury's verdicts, defendant moved for a new trial on the ground of newly discovered evidence. A month after the jury's verdicts, Salvador Gonzalez had made a statement to the police in which he said that he had been the getaway driver in the robbery of Joe Escobar Diamonds. Defendant asserted that, because his convictions had been based on Norris's testimony that defendant was the getaway driver, his discovery of Gonzalez's statement merited a new trial. Although Gonzalez's attorney had informed the defense that Gonzalez would invoke the Fifth

9

Amendment if called to testify in support of the motion, the defense claimed that Gonzalez's statement to the police would be admissible as a statement against penal interest under Evidence Code section 1230.

The court held an evidentiary hearing on the motion, and the police officer who had interviewed Gonzalez in August 2011 testified at the hearing. Although the defense called Gonzalez to testify at the hearing, he invoked his Fifth Amendment rights and refused to answer questions. A transcript of the interviews of Gonzalez was introduced at the hearing.

The officer testified that, by the time he interviewed Gonzalez, the police had identified three of the four men involved in the robbery of Joe Escobar Diamonds (defendant, Zamora, and Banks), and they suspected that Gonzalez was the fourth man. Gonzalez's DNA was on a black ski mask found in the Honda and on a pair of black pants discarded by the robbers in their flight from the Honda. His DNA was not on the red ski mask.

The officer interviewed Gonzalez at a rehabilitation facility where Gonzalez was incarcerated for a subsequent armed robbery. At the beginning of the interview, he told Gonzalez that defendant and Zamora had not been cooperative but that Gonzalez had been "very cooperative" when he had spoken to him in the past. The officer said that Gonzalez was "different" than defendant and Zamora and was "trying to do better" in his life. He explained to Gonzalez that this was his opportunity to tell "your side of the story" so that the police could go to the prosecutor and tell him that Gonzalez "wants to try to get some consideration for, for giving a truthful statement . . . ." The officer and his fellow officer, who was also present for the interview, told Gonzalez that defendant and Zamora were each facing more than 90 years in prison. He informed Gonzalez that the police already had evidence that Gonzalez and Zamora had been in contact by phone on the morning of the robbery, and "[w]e have your DNA on the black ski mask . . . ."

10

"[W]e're just trying to get you to kind of help yourself out and continue to go on the path that you're going . . . ."

This colloquy followed: "[Officer]: Okay. So, do you want to go down the path that Angel's goin? and Mario? Or do you want or do you want to continue to go down that path that you're at right now? [¶] [Gonzalez]: Well, honestly, to be honest with you . . . I would like somebody here, that would be able to help me out, cause I honestly think that, I've been cooperative every single time you guys came to me." The officer reiterated that "[w]e know you're involved because we have your DNA on the clothing." "[W]e know you didn't have a gun . . . we know you didn't lead anybody on pursuits. Okay? Um, do you want us to [arrest you so] you can sit in County Jail with Mario Zamora, or do you want to give us your side of the story of what it was? . . . We're trying to give you your opportunity to explain. You're obviously . . . tryin to do better for yourself now, try to help us understand why you got involved in that. You don't seem to fit the mold of Angel or Mario, does that make sense?" At this point, Gonzalez asked for a pen and paper and said he would "write everything down."

Gonzalez handwrote a statement concerning the robbery of Joe Escobar Diamonds. In his written statement, he said that "they" had called him wanting to "buy pot" from him. "They" came and "got pot off me" and then took him to someone else who they said wanted more pot. He went with "them in a Charger with rims." At that point, he was told to drive "and if I didn't I would get pistol whip[ped] and my ass kicked." "I was then taken to a store where they jumped with black clothing and they robbed the store and then they came back in. They told me to drive and I then saw police all around me. They told me to keep driving . . . ."

After Gonzalez produced this written statement, the officers questioned him about these events. Gonzalez asserted that he did not know any of the participants but Zamora, whom he identified as "John." Gonzalez knew Zamora because Zamora had bought pot from him before. When Gonzalez was shown a photo of defendant, he said he had "seen

11

him before." Zamora came to Gonzalez's house that morning alone in the Charger, and he had Gonzalez drive the Charger from there to another house. When they arrived at the other house, where someone else was supposed to buy more pot, two other men, an African-American and a Hispanic, were there.[13] These men were "so aggressive" and told him to "drive this fuckin car, you're gonna do it . . . ." He said "whoa, what the fuck's goin on here, and then they take out a gun . . . ." Early on in the interview, Gonzalez said that it was the Hispanic guy who had the gun. Later, he said it was the African-American man who had the gun. Gonzalez claimed that he was "pretty fucked up, pretty high" at the time. These men told Gonzalez to drive another car, which was black, with the African-American man as his passenger, and he followed the Charger that had Zamora and the Hispanic man in it. The Charger parked, and the other men got into the car Gonzalez was driving.

Gonzalez then drove to Joe Escobar Diamonds. He recalled backing the car up in the parking lot outside the store, which he claimed he did at the insistence of the African-American man. Gonzalez claimed that he did not know what was going on until the men put on ski masks. Gonzalez claimed that he was told to put on a ski mask while he waited in the car. He took off the mask after they pulled out of the parking lot.

After they abandoned the car and ran, Gonzalez said he took off his pants but was still wearing pants. The officer inquired about this discrepancy, and Gonzalez said that he was wearing two pairs of pants because "those were my fuckin work out pants sir." The officer expressed doubt since "when people wear two pairs of pants, usually it means they know something's gonna happen." Gonzalez then said he had two pairs of pants because "I had the weed rolled up in the pants." He asserted that he was not actually wearing two pairs of pants originally but was carrying the second pair of pants with the

---

[13]     Ezell Banks is African-American.

12

"weed" wrapped in it and had put on the second pair of pants before they went to commit the robbery.

Gonzalez told the officers: "I know it puts me involved in the robbery, I know that for a fact, but also, I'm gonna, I'm gonna give the right story and the real story." The officer told Gonzalez: "[I]t doesn't, doesn't make a difference if you go into the store, or if you stay in the car . . . you understand that?" Gonzalez replied: "Yes sir I understand completely. I'm involved . . . ." He also acknowledged that "[e]ither way, I'm involved," but he insisted that "I did not go inside the store. I was driving the car." The officer told Gonzalez: "I'm not disputing the fact that somebody forced you to do something . . . ." Gonzalez told the officers that he would like to "just go with you guys now" because "I'm gonna get arrested regardless" for his involvement in the robbery. Gonzalez consistently denied that he was a Norteno. The officers transported Gonzalez to the police station to make a recorded statement.

The defense argued that Gonzalez's statement was admissible as a statement against penal interest and that any exculpatory statements could be redacted. The prosecution argued that Gonzalez's statement was inadmissible hearsay because it was "partially self-serving and unreliable." It maintained that Gonzalez's "back was against the wall and that he is making this statement to minimize his involvement in the robbery" after learning that the police had his DNA on one of the ski masks from the robbery.

The court denied the new trial motion. It agreed with the prosecution that Gonzalez's "back was firmly against the wall" when he made the statements. The court concluded that Gonzalez's statements were "motivated by some desire to curry favor and to explain and minimize to the greatest extent possible his participation in the crime." "In fact, the statement when taken in its entirety, is a clear attempt to exculpate himself and explain away his participation in the crime." "He professes complete ignorance of the criminal plan and sets himself up as an innocent pawn who acted involuntar[il]y under

13

the specific threat of a pistol whipping and beating and other unspoken menace from the man weilding [*sic*] the gun."

The court found that Gonzalez's "version of events is not worthy of belief." "Faced with knowledge that he couldn't deny his presence, his statements simply proceeded to cast it, the entire incident, in a light most favorable to him." Redaction was not an option because "the entire statement is self-serving and exculpatory because it describes every one of his actions as being undertaken without knowledge of the criminal plan and not by choice but by duress."[14] "[I]t is far from specifically dis-serving of his penal interest and, in fact, positively serves those interests."

The court also found that there was no reasonable possibility that, even if the evidence was admissible, the result would be different with its admission. "In order to reach the verdicts in this case, it was not necessary for the jury to believe that the defendant was the driver of the Honda." The jury could have concluded that defendant was one of the men who went into the store, particularly since his DNA was on the red ski mask that was worn by one of the men who went into the store. "He was even acquitted of one count of evading a peace officer which is entirely consistent with the jury having concluded he was not the driver in the count involving the Honda."

## 2. Analysis

We review a trial court's denial of a motion for a new trial for abuse of discretion. (*People v. Verdugo* (2010) 50 Cal.4th 263, 308.) Here, the trial court based its denial of

---

[14] Defendant does not argue on appeal that the court abused its discretion in failing to admit a redacted version of Gonzalez's statement. "[R]edaction cannot enhance the underlying or general trustworthiness of a declaration as a whole. By its nature an after-the-fact process employed with respect to a previously existing declaration, redaction as a logical matter simply cannot bear on, let alone alter, the declarant's motives or any other circumstance that might affect a given declaration's fundamental reliability and inform a court's assessment thereof." (*People v. Duarte* (2000) 24 Cal.4th 603, 614 (*Duarte*).)

14

the motion on its finding that Gonzalez's statement was not admissible under Evidence Code section 1230. "'Newly discovered evidence must be admissible to form a basis for granting a new trial.'" (*In re Joaquin S.* (1979) 88 Cal.App.3d 80, 85.) We also review the trial court's finding on the admissibility of Gonzalez's statement for abuse of discretion. (*People v. Lawley* (2002) 27 Cal.4th 102, 153 (*Lawley*).)

"Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.) "The proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*Duarte*, *supra*, 24 Cal.4th at pp. 610-611.)

It is undisputed that Gonzalez was unavailable; the issues before the trial court were whether his statement was against his penal interest when it was made and whether it was sufficiently reliable. His statement was facially inculpatory as it potentially subjected him to penal consequences as a participant in the robbery. However, that alone did not make it admissible under Evidence Code section 1230. "[T]hat a hearsay statement may be facially inculpatory or neutral cannot always be relied upon to indicate whether it is 'truly self-inculpatory, rather than merely [an] attempt[] to shift blame or curry favor.' [Citation.] Even a hearsay statement that is facially inculpatory of the declarant may, when considered in context, *also* be exculpatory or have a net exculpatory effect. . . . '[W]hether a statement is self-inculpatory or not can only be determined by viewing it in context.'" (*Duarte*, *supra*, 24 Cal.4th at pp. 611-612.) "[A] hearsay statement 'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of

15

trustworthiness and is thus inadmissible.'" (*Duarte*, at p. 612.) "'To determine whether [a particular] declaration [against penal interest] passes [section 1230's] required threshold of trustworthiness, a trial court "may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant."'" (*Duarte*, at p. 614.)

The only portion of Gonzalez's statement that could potentially support defendant's new trial motion was Gonzalez's claim that Gonzalez was the getaway driver. Yet the circumstances under which Gonzalez made his statement suggested that he had a motivation to *falsely* claim to be the getaway driver. Gonzalez knew at the outset that the police had DNA and other evidence linking him to the robbery. Thus, he had little to lose by admitting that he had been "involved" in the robbery. The police officer interviewing him also led him to believe that he would be treated more leniently if he was cooperative and made a statement. In this context, Gonzalez's claim that he had no inkling that a robbery was planned, that he was forced to participate, and that his role was limited to serving as the getaway driver was an obvious attempt to "'place[] the major responsibility on others.'" (*Duarte*, *supra*, 24 Cal.4th at p. 612.) A "reasonable man in [Gonzalez's] position" might well have *falsely* claimed to have been forced to serve as the getaway driver in order to minimize his criminal responsibility, shift the major blame to others, and curry favor. (Evid. Code, § 1230.)

Defendant relies on *People v. Jackson* (1991) 235 Cal.App.3d 1670 (*Jackson*). In *Jackson*, the defendant sought to testify at trial that a third party had admitted to the defendant that the third party had shot at the victim. (*Jackson*, at p. 1677.) The trial court excluded this evidence, but the Court of Appeal found that it was admissible under Evidence Code section 1230 because a reasonable person would not have made that admission unless it was true. (*Jackson*, at p. 1678.) *Jackson* is readily distinguishable. Unlike here, the circumstances of the statement in *Jackson* did not reflect that the third party had any motivation to shift blame or curry favor when he made this statement to

16

defendant, and his admission that he had shot at the victim did not minimize his criminal responsibility. Nothing in *Jackson* suggests that the trial court in this case abused its discretion in finding that Gonzalez's statement was not admissible under Evidence Code section 1230. None of the other cases cited by defendant found an abuse of discretion in a trial court's ruling that a statement was not admissible under Evidence Code section 1230. We conclude that the trial court acted within its discretion in finding Gonzalez's statement inadmissible and denying defendant's new trial motion on that ground.

Although defendant asserts that the trial court's denial of his motion deprived him of due process and the right to present a defense, he premises these contentions on the court's alleged abuse of discretion in finding that Gonzalez's statement was inadmissible. "The general rule remains that ' "the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense. Courts retain . . . a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice." ' " (*Lawley*, *supra*, 27 Cal.4th at p. 155.) Since the trial court did not abuse its discretion in finding Gonzalez's statement inadmissible, it did not violate defendant's right to present a defense or his right to due process.

## B. Gang Allegations

### 1. Background

Defendant made an in limine motion seeking bifurcation of the gang allegations. He claimed that the gang evidence was not relevant to the charged offenses and would be "unduly and extraordinarily prejudicial" to him. The prosecutor opposed the motion on the ground that the gang evidence was relevant to the motive and planning for the robberies and that it was "inextricably intertwined" with evidence of the crimes. She argued that the purpose of the crime was making money for the gang. Although the court

17

thought this was a "close case" on this point, it concluded that the gang evidence was "inextricably intertwined" with evidence of the robbery and denied the motion.

The prosecution did not present any gang evidence until its next to last witness testified.[15] This witness, Sergeant Dan Livingston, first testified about his involvement in the investigation of the crime. After he had given that testimony, the prosecutor shifted to his gang expertise. Livingston testified about his expertise, and the court qualified him as an expert.

Livingston identified the Norteno gang as a criminal street gang. He testified that the primary activities of the Norteno gang included "[m]urder, attempted murders, assault with deadly weapons, kidnapping, sales of drugs, extortions, thefts, shooting at an inhabited dwelling. I could continue to go on. Basically anything that will generate money for them or respect through violence, they will do. Robberies." Livingston testified about three predicate offenses by Norteno gang members. One was an assault with a knife by a Norteno gang member on a Sureno. Another was an armed robbery by a Norteno gang member of someone he believed was a Sureno gang member. The third predicate offense was an assault with a bat by a Norteno gang member.

Livingston expressed the opinion that defendant was a Norteno gang member. In 2007, defendant threatened a person with a knife while wearing Norteno gang indicia and invoking the name of his gang. In 2008, gang items were found in defendant's bedroom. Livingston also testified that Mario Zamora, whose cell phone was found in the Charger, and who was one of defendant's coparticipants in the robbery of Joe Escobar Diamonds, was a self-admitted Norteno gang member. Ezell Banks, the gunman in the robbery, was an associate of a gang called Midtown Taliban. The police also believed that another

---

[15] The last witness gave brief testimony about defendant's capture from underneath the witness's barbeque.

18

coparticipant in the robbery was Gonzalez, who Livingston also identified as a Norteno gang member. In addition, the police suspected that Anthony Campos, who was the boyfriend of defendant's girlfriend's sister (the owner of the Honda) and was a Norteno gang member, had been involved in the planning of the robbery. Livingston testified that this type of robbery would benefit the Norteno gang by providing money to finance gang activities. He also testified that the fact that multiple Norteno gang members were involved in the robbery meant that the robbery was committed in association with the Norteno gang. Livingston further believed that the robbery had been at the direction of the Norteno gang because the coparticipants had conspired to commit it.

### 2. Refusal to Bifurcate

"[T]he criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense. So less need for bifurcation generally exists with the gang enhancement than with a prior conviction allegation." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048.) Nevertheless, a trial court does have discretion to bifurcate gang enhancement allegations. "The predicate offenses offered to establish a 'pattern of criminal gang activity' (§ 186.22, subd. (e)) need not be related to the crime, or even the defendant, and evidence of such offenses may be unduly prejudicial, thus warranting bifurcation. Moreover, some of the other gang evidence, even as it relates to the defendant, may be so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (*Hernandez*, at p. 1049.) But "[e]ven if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself—for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged—a court may still deny bifurcation." (*Hernandez*, at p. 1050.) This is true because, where the gang evidence is "offered [solely] to prove the charged gang enhancement, . . . no problem of confusion with collateral matters would arise . . . ." (*Id.* at p. 1051.) Bifurcation is necessary only

19

where the gang evidence is "so minimally probative on the charged offense, and so inflammatory in comparison, that it threaten[s] to sway the jury to convict regardless of defendants' actual guilt." (*Ibid.*)

This was a case in which the trial court realistically *could* have bifurcated the gang allegations since all of the gang evidence came from a single witness, and his expert testimony was only "minimally probative" as to the substantive offenses. Nonetheless, the gang evidence was not comparatively "so inflammatory" that it threatened to cause the jury to convict defendant of the substantive offenses regardless of his guilt. The most inflammatory evidence in this case was the evidence of defendant's lengthy, persistent, reckless, and life-threatening flight from the police. He demonstrably risked the lives of both police officers and the general public during his flight through residential areas and down heavily travelled freeways. In contrast, Livingston's expert testimony about gangs was brief and relied on predicate offenses that were less inflammatory than the charged offenses.

Defendant cites *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*) in support of both this argument and his challenge to the sufficiency of the evidence to support the gang allegations. *Albarran* did not concern bifurcation. In *Albarran*, the defendant was tried on substantive charges with gang allegations. A "panoply" of "extremely inflammatory" gang evidence was admitted at trial over defense objections. (*Albarran*, at p. 227.) The jury found the defendant guilty of the substantive charges and found the gang allegations true. However, the trial court granted the defendant's motion for a new trial on the gang allegations on the ground of insufficiency of the evidence, and the prosecution dismissed the gang allegations. On appeal, the defendant asserted that the court should have granted a new trial on the substantive counts because the gang evidence was so inflammatory and irrelevant to the substantive counts that it had prejudiced him on the substantive counts. (*Albarran*, at p. 217.) The Fourth District majority agreed with the defendant. (*Albarran*, at p. 227.) "[C]ertain gang evidence

20

admitted was so extraordinarily prejudicial and of such little relevance that it raised the distinct potential to sway the jury to convict regardless of Albarran's actual guilt." (*Albarran*, at p. 228.) In the majority's view, the gang evidence's "paramount function . . . was to show Albarran's criminal disposition . . . ." (*Albarran*, at p. 228.)

*Albarran* has no bearing here. The gang evidence in this case was not inflammatory or extraordinarily prejudicial. Livingston provided background information about gangs and testified that defendant and some of his coparticipants were gang members. He described a few predicate offenses committed by people unconnected with defendant except by the fact that they were also Nortenos. And he explained how these crimes could benefit the gang. This testimony was fairly brief in the context of this lengthy trial, and it did not characterize defendant's gang activities in a fashion that was anywhere near as dangerous to the community as his conduct in committing the substantive crimes. Livingston's testimony about gangs did not have the potential to sway the jury to convict defendant of the substantive offenses regardless of his actual guilt. Hence, we find no abuse of discretion in the trial court's decision not to bifurcate the gang allegations.

### 3. Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence to support the gang enhancement allegations.

Our standard of review is well established. " '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576, quoting *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319.) "[The] appellate court must view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People* v. *Reilly* (1970) 3 Cal.3d 421, 425; accord *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1237.) "A

21

reasonable inference, however, 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.'" (*People* v. *Morris* (1988) 46 Cal.3d 1, 21, disapproved on another point in *In re Sassounian* (1995) 9 Cal.4th 535, 543-544, fn. 5.) A trier of fact may rely on inferences to support a conviction only if those inferences are "of such substantiality that a reasonable trier of fact could determine beyond a reasonable doubt" that the inferred facts are true. (*People* v. *Raley* (1992) 2 Cal.4th 870, 890-891.) "Evidence is sufficient to support a conviction only if it is substantial, that is, if it '"reasonably inspires confidence"' [citation], and is 'credible and of solid value.'" (*Ibid.*)

A section 186.22, subdivision (b) gang allegation has two elements. The crime must be "committed for the benefit of, at the direction of, or in association with any criminal street gang," and the defendant must harbor "the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) The prosecution's primary theory in support of the first element was that the robbery was committed to provide funds "for the benefit of" the Norteno gang. Its theory for the second element was that defendant intended to assist in the criminal conduct of his coparticipants, at least two of whom were fellow Norteno gang members. Defendant's challenge is to the specific intent element.[16]

Four key pieces of evidence provided the requisite support for the prosecution's theory. First, defendant was a Norteno gang member. Second, at least two of his coparticipants were Norteno gang members. Three, the robbery was carefully planned out in advance and required coordination between the participants. Four, the robbery was

_____

[16]     Although defendant appears in his opening brief to be challenging both elements, and the Attorney General clearly understood that to be the case, defendant asserts in his reply brief that he is challenging only the specific intent element.

aimed at high value merchandise that could be readily converted into cash. The jury could reasonably conclude that a robbery aimed at high value merchandise that was planned and executed by a group of Norteno gang members was intended to benefit the gang. It could also reasonably infer that defendant participated in the robbery with the intent to assist his fellow gang member coparticipants.

None of the cases upon which defendant relies provides support for his argument.[17] *In re Frank S.* (2006) 141 Cal.App.4th 1192 (*Frank S.*) was a challenge to the sufficiency of the evidence to support the specific intent element. Frank was stopped by police after he ran a red light on his bicycle. He gave a false name, and the officer found a concealed knife, a bindle of methamphetamine, and a red bandana in Frank's possession. (*Frank S.*, at p. 1195.) Frank admitted that he carried the knife to protect himself against "'Southerners,'" as he was allied with northern street gangs. (*Frank S.*, at p. 1195.) The gang expert was permitted to testify that Frank had possessed the knife to protect himself, and she opined that gang members use knives to protect themselves from rival gang members and to assault rival gang members. (*Frank S.*, at pp. 1195-1196.) The Fifth District concluded that the expert should not have been permitted to testify "that a specific individual possessed a specific intent." (*Frank S.*, at p. 1197.) As the expert's testimony was, in the Fifth District's view, "the only evidence" of Frank's intent, the true finding on the enhancement allegation was not supported by substantial evidence. (*Frank S.*, at pp. 1197-1199.)

The holding in *Frank S.* is not relevant here. Livingston did not testify that defendant actually harbored the requisite specific intent. His testimony simply provided the necessary predicate for a reasonable inference that defendant harbored the requisite

---

[17] As we have already noted, *Albarran* is distinguishable. It did not involve a contention that there was insufficient evidence to support the specific intent element of a gang allegation.

intent. Because defendant participated in a planned robbery with fellow Norteno gang members, it could be inferred that he intended to assist in their criminal conduct.

Defendant also cites *People v. Ramon* (2009) 175 Cal.App.4th 843 (*Ramon*), which, like *Frank S.*, was a Fifth District case concerning the sufficiency of the evidence to support the specific intent element. Ramon, a gang member, was stopped by police in his gang's territory while driving a stolen truck. A fellow gang member was his passenger, and an unregistered firearm was found under the driver's seat. (*Ramon*, at pp. 846-847, 849.) The prosecution's gang expert testified at trial that the stolen truck and the unregistered firearm could be used to commit gang crimes. (*Ramon*, at p. 847.) He offered an opinion that possession of a gun and driving of a stolen truck in gang territory therefore benefitted the gang and that the perpetrators of these offenses would intend to promote the gang. (*Ramon*, at p. 848.) The expert testified that stolen trucks and firearms were "tools" that the gang needed to commit other crimes. (*Ibid.*)

Ramon argued on appeal that the facts of his offenses plus the fact of his gang membership and presence in gang territory were insufficient to support the expert's opinion on benefit and intent. (*Ramon*, *supra*, 175 Cal.App.4th at pp. 849-850.) The Fifth District, relying on *Frank S.*, agreed. (*Ramon*, at p. 851.) "These facts, standing alone, are not adequate to establish that Ramon committed the crime with the specific intent to promote, further, or assist criminal conduct by gang members. While Ramon may have been acting with this specific intent, there is nothing in the record that would permit the People's expert to reach this conclusion." (*Ramon*, at p. 851.) "The facts on which [the gang expert] based his testimony were insufficient to permit him to construct an opinion about Ramon's specific intent in this case. His opinion, therefore, cannot constitute substantial evidence to support the jury's finding on the gang enhancement." (*Ramon*, at p. 852.) "While the People's expert's opinion certainly was one possibility, it was not the only possibility. And, as stated *ante*, a mere possibility is not sufficient to support a verdict." (*Ramon*, at p. 853.)

24

*Ramon* is no more relevant here than *Frank S.* While the mere possibility that the gun possessed by Ramon could be used for gang purposes was not enough to support the specific intent element, defendant actually committed a carefully preplanned robbery in concert with fellow gang members. The specific intent element was easily established.

Defendant's reliance on *People v. Ochoa* (2009) 179 Cal.App.4th 650 (*Ochoa*) is no more helpful to his case. *Ochoa* was a Fourth District case in which Ochoa challenged the sufficiency of the evidence to support the gang benefit element of the gang enhancement allegations attached to carjacking and felon in possession of a firearm counts. (*Ochoa*, at p. 652.) Ochoa, a gang member, had acted alone in committing a carjacking with a shotgun. (*Ochoa*, at p. 653.) The offense had not occurred in Ochoa's gang's territory. (*Ochoa*, at p. 662.) A divided Fourth District panel found the evidence insufficient to sustain the benefit element of the gang enhancements. "[N]othing in the circumstances of the instant offenses sustain[s] the expert witness's inference that they were gang related." (*Ochoa*, at pp. 661-662.) "[The gang expert's testimony] was based solely on speculation, not evidence. An appellate court cannot affirm a conviction based on speculation, conjecture, guesswork, or supposition." (*Ochoa*, at p. 663.) On the other hand, the *Ochoa* court disagreed with the *Ramon* court's assessment of the evidence in *Ramon* and said that it would have found that evidence sufficient to support the specific intent element. (*Ochoa*, at p. 661, fn. 6.)

*Ochoa* is distinguishable. Defendant is challenging the sufficiency of the evidence as to only the specific intent element. In any case, since defendant committed a high value, preplanned robbery in concert with his fellow Norteno gang members, it was not speculation to infer that they intended to use the loot to benefit their gang.

Defendant also seeks to support his contention by citing *In re Daniel C.* (2011) 195 Cal.App.4th 1350 (*Daniel C.*). *Daniel C.* was a First District case in which Daniel challenged the sufficiency of the evidence to support the specific intent element. Daniel and three other young men, all wearing red, went into a store. Two of Daniel's

companions were gang members, and he was an "affiliate." After his companions left the store, Daniel took a bottle of liquor and left without paying for it. A store employee confronted him, and Daniel broke the bottle and attacked the employee with the broken bottle. He then escaped in a vehicle with the other young men. (*Daniel C.*, at pp. 1353-1355, 1362.) A gang expert testified that the robbery was "gang-related" based on gang membership, the coordinated actions of the young men, the fact that they were wearing red, and the fact that crow bars and a baseball bat were found in the vehicle. (*Daniel C.*, at p. 1356.) The First District found the evidence insufficient to support the specific intent element of the gang enhancement allegation because there was no evidence that defendant had acted "in concert" with his companions. Consequently, as Daniel was not himself a gang member, he could not have intended to assist "gang members" in committing the robbery (which the First District concluded he perpetrated alone), and the specific intent element therefore lacked evidentiary support. (*Daniel C.*, at pp. 1361-1362.)

As is the case with defendant's other citations, *Daniel C.* is readily distinguishable. The First District found that the evidence did not show that Daniel was a gang member, but defendant does not challenge the evidence that he and his coparticipants in the robbery were Norteno gang members. The First District concluded that Daniel acted alone, but defendant indisputably acted in concert with his fellow gang members. *Daniel C.* is not on point.

Evidence that defendant, a Norteno gang member, joined with fellow Norteno gang members in meticulously planning and executing a robbery of high value merchandise was sufficient to support a reasonable inference that defendant participated with the intent to assist his fellow gang members in carrying out the robbery. It follows that substantial evidence supports the gang allegations.

### C. Multiple Reckless Evading Convictions

Defendant argues that he could not be convicted of two reckless evading counts because the pursuit of the minivan was a single pursuit rather than two separate pursuits.

Defendant was charged with three reckless evading counts. As the prosecutor explained in her argument to the jury, the first one was based on the pursuit of the Honda. The second one was based on Cefalu's pursuit of the minivan. The third one was based on Lloyd's pursuit of the minivan. Defendant's trial counsel conceded in closing argument that defendant was driving the minivan, but he argued that Cefalu's pursuit and Lloyd's pursuit of the minivan were just one pursuit. The jury was unable to reach a verdict on the first reckless evading count, but it convicted defendant on the second and third reckless evading counts. The court imposed a consecutive subordinate term for one of the reckless evading counts and a concurrent term for the other.

" '[A] charge of multiple counts of violating a statute is appropriate only where the actus reus prohibited by the statute—the gravamen of the offense—has been committed more than once.' " (*People v. Jimenez* (1992) 11 Cal.App.4th 1611, 1623, disapproved on another point in *People v. Kobrin* (1995) 11 Cal.4th 416, 419-420.) The actus reus of reckless evading has two parts. The driver must be fleeing or attempting to elude "a pursuing peace officer." And the driver must drive "in a willful or wanton disregard for the safety of persons or property," which occurs when the driver commits "three or more violations that are assigned a traffic violation point count . . . ." (Veh. Code, § 2800.2.)

It is significant that Vehicle Code section 2800.2 explicitly refers to flight from "a" pursuing officer. Defendant's first flight was from Cefalu. His second flight was from Lloyd. These were separate acts by defendant that occurred at separate times and places and were flights from different officers. During his flight from Cefalu, he committed at least three violations of the requisite type. And during his subsequent flight from Lloyd he committed at least three *separate* violations of the requisite type. Since

27

defendant committed the actus reus of reckless evading twice, he could be convicted of two counts of reckless evading.

Defendant relies heavily on *People v. Copass* (2009) 180 Cal.App.4th 37 (*Copass*). *Copass* has nothing to do with the propriety of multiple convictions. Copass was convicted of a *single* count of reckless evading. A police officer signaled Copass to pull his motorcycle over, and Copass appeared to be complying by moving to the shoulder. When the officer approached him, Copass rode off at high speed without signaling with the officer in pursuit. The officer briefly lost sight of Copass and turned off his emergency lights to avoid alarming other motorists while he searched for Copass. Within five minutes, the officer was alerted by another officer to Copass's location, and he proceeded to that location. The officer saw Copass commit another traffic violation. Once he had positioned himself behind Copass, he reactivated his emergency lights and siren. Copass committed more traffic violations before the officer was able to block his path and force him to surrender. (*Copass*, at pp. 39-40.)

On appeal, Copass claimed that one of his traffic violations could not serve as a predicate for the reckless evading count because the officer's emergency lights were not activated at that time. (*Copass*, *supra*, 180 Cal.App.4th at p. 40.) The Second District rejected Copass's claim. First, the court found that the officer's brief loss of visual contact with Copass did not mean that the original pursuit was at an end. "[T]here was but one pursuit." (*Copass*, at p. 41.) Since Copass had already seen the officer's emergency lights and heard his siren, it was immaterial that the lights and siren were not active at the time of one of Copass's four traffic violations. (*Ibid.*) Second, any error in permitting the jury to consider the one traffic violation during which lights and siren were not active was harmless because it was reasonably probable that the jury still would have found the other three traffic violations sufficient to support the conviction, as only three traffic violations are required for a reckless evading conviction. (*Copass*, at p. 42.)

Defendant contends that *Copass* supports his argument that he committed only one reckless evading, rather than two. But *Copass* says nothing relevant about the situation before us. In *Copass*, a *single* officer was pursuing Copass and lost visual contact with him for less than five minutes before resuming his pursuit. Copass committed one set of traffic violations, not two sets. Here, defendant successfully eluded Cefalu and was free from pursuit until Lloyd, who had not previously been among those pursuing him, initiated a pursuit that was temporally and spatially separate and distinct from the earlier one. Defendant committed a complete set of the requisite type of traffic violations during Cefalu's pursuit, and he committed a second complete set of the requisite type of traffic violations during Lloyd's pursuit. He was properly found to have committed two counts of reckless evading.

Defendant cites but does not discuss *People v. Garcia* (2003) 107 Cal.App.4th 1159 (*Garcia*). *Garcia*, unlike *Copass*, did concern the validity of multiple reckless evading convictions. The Second District held that Garcia could not be convicted of multiple reckless evading counts where there was a single pursuit by multiple officers. The distinction between Garcia's conduct and that of defendant is that Garcia engaged in a single, continuous, uninterrupted flight from multiple officers, who were acting in concert, and Garcia committed an uninterrupted set of traffic violations during that uninterrupted flight. As there was but a single flight, he could not be subjected to multiple convictions. In contrast, defendant engaged in two unconnected flights at two different times and in two different places from two different officers, who were not jointly engaged in pursuing him. Garcia did not engage in multiple acts, while defendant did. Multiple convictions were therefore permitted here.

### D. Multiple Enhancement Terms

Defendant contends that the trial court erred in imposing both a 10-year term for the section 186.22 gang enhancement and a consecutive 10-year term for the section

29

12022.53, subdivision (e) firearm enhancement. The Attorney General concedes that the trial court erred in imposing both enhancement terms and that a remand is required.

Section 12022.53, subdivision (e)(2) provides: "An enhancement for participation in a criminal street gang pursuant to Chapter 11 (commencing with Section 186.20) of Title 7 of Part 1 *shall not be imposed* on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense." (§ 12022.53, subd. (e)(2), italics added.) Where the defendant did not personally use or personally discharge a firearm, he may not be subjected to an increased sentence under both sections 186.22 and 12022.53. (*People v. Brookfield* (2009) 47 Cal.4th 583, 594.)

It was not alleged or found true that defendant personally used or personally discharged a firearm, so he could not be subjected to both enhancements. The trial court was required to impose the section 12022.53 enhancement term unless another enhancement term would produce a longer prison sentence. (§ 12022.53, subd. (j).) Here, imposition of the gang enhancement term, rather than the section 12022.53 enhancement term would produce a longer prison term. This is true because the court could impose the one-year section 12022 firearm enhancement term in addition to the 10-year section 186.22 enhancement term for a total of 11 added years, but it could not impose the one-year section 12022 enhancement term if it imposed the 10-year section 12022.53 enhancement term. (§ 12022.53, subd. (f) ["An enhancement involving a firearm specified in Section . . . 12022 . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this section."].) Accordingly, we remand to the trial court for it to strike the section 12022.53 enhancement terms and impose instead the section 12022 enhancement terms on the relevant counts.

## E.  Restitution

Defendant contends that the trial court abused its discretion in awarding restitution for the full retail value of all of the watches taken since all of the watches were returned to Joe Escobar Diamonds.

Stacey Escobar, the vice-president of Joe Escobar Diamonds, testified at trial that all of the Rolex watches were returned by the police.  Four of them had been damaged by being dropped.  She testified that costs were incurred to repair the four damaged watches.  Joe Escobar Diamonds also paid $1,200 to repair the damaged display cases.  The full retail value of the watches taken by the robbers was $163,000.[18]  The probation report noted that all of the watches taken from the store had been recovered and released to Joe Escobar Diamonds.  Nevertheless, Stacey Escobar sought $168,375 in restitution.

At the end of the sentencing hearing, the court ordered defendant to "pay victim restitution" and noted that "[t]here has been a request for restitution submitted in this case in the total amount of $168,375."  The court pointed out that "there did not appear to be a reflection claimed of whatever sales price the store was able to obtain for the watches once the refurbishing had been accomplished."  The defense requested a restitution hearing, and the court scheduled one.

At the commencement of the restitution hearing, the court said:  "I did ask the People at the time of the previous hearing to make a determination as to whether or not that amount reflected the reduced value sales and cost of repairs that had accompanied the return of the property to the victim."  The prosecutor explained that she had spoken to Stacey Escobar, and Escobar had told her that $168,375 was the "actual loss."  "I explained what actual loss is and she replied, yes, and then contacted me just this

---

[18]     There was also evidence presented at trial that Joe Escobar Diamonds had purchased the Rolex watches for $96,000.

31

morning and asked if she additionally gets money for the amount of time the watchmaker, like his hourly wages, to work on some of these watches as well. [¶] So she indicated that $168,375 is their actual loss. She said she came to the number, the watches, the glass that was shattered and worker's, employee's time. . . . I explained to her sort of the difference between what the chart shows and what she actually sold it as. I asked her if this was her actual loss, and her reply was yes."

The court then told the defense that it was now the defense's burden to contradict the "documentation" submitted by Escobar. The defense admitted that it had no "evidence to contradict it." Instead, defendant's trial counsel challenged the admissibility of the documentation. The court rejected this challenge. Because there was "no contrary evidence presented," the court ordered restitution of $168,375 to Joe Escobar Diamonds.

The Attorney General concedes that the trial court's restitution award cannot be upheld. We agree. "A restitution order is intended to compensate the victim for its actual loss and is not intended to provide the victim with a windfall." (*People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1172 (*Chappelone*).) While we review the trial court's order under the deferential abuse of discretion standard (*id.* at p. 1173), and "the court need not order restitution in the precise amount of loss, it 'must use a rational method that could reasonably be said to make the victim whole, and may not make an order which is arbitrary or capricious.'" (*Id.* at p. 1172.)

Stacey Escobar's trial testimony established that all of the watches were returned to Joe Escobar Diamonds and that only four of them were damaged. Yet she sought restitution for an amount that obviously exceeded the cost to repair the display cases and repair the four damaged watches, and appeared to instead include the full retail value of all of the watches despite the fact that 10 of the watches had been returned to Joe Escobar Diamonds undamaged. On this record, the trial court could not have rationally concluded that Joe Escobar Diamonds' "actual loss" included the full retail value of the 10 undamaged watches that had been returned to it. Such an award would provide Joe

32

Escobar Diamonds with a windfall. We therefore agree with both defendant and the Attorney General that the appropriate remedy is to remand for a new restitution hearing at which the trial court shall determine the true amount of the actual loss sustained by Joe Escobar Diamonds.

## IV. Disposition

The judgment is reversed. On remand, the trial court shall strike the section 12022.53 enhancement on those counts where there is also a section 186.22 gang enhancement and shall resentence defendant accordingly. The court shall also vacate its restitution order and hold a new restitution hearing to determine the amount of the actual loss sustained by Joe Escobar Diamonds.

33

_____
Mihara, J.

WE CONCUR:

_____
Premo, Acting P. J.

_____
Grover, J.